NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

### DIVISION ONE

---

JEREMY M., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.J., *Appellees*.

No. 1 CA-JV 16-0134
FILED 2-9-2017

---

Appeal from the Superior Court in Maricopa County
No. JS517568
The Honorable Rodrick J. Coffey, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Margaret H. Downie joined.

---

**B R O W N**, Chief Judge:

¶1 Jeremy M. ("Father") appeals the juvenile court's order terminating his parental rights to his son, J.J. For the following reasons, we conclude that reasonable evidence supports the court's order and therefore affirm.

**BACKGROUND**

¶2 Father and Niaesha J. ("Mother") are the biological parents of J.J. (born in 2006). Mother and Father's relationship ended prior to J.J.'s birth and Father moved to North Carolina, where he has resided for most of J.J.'s life. In March 2012, the Tempe Police Department SWAT team raided the home where Mother lived with her boyfriend, Jose D., and a roommate. Jose D. and the roommate had cocaine stolen from them the day before. They kidnapped the alleged thieves at gunpoint, brought them back to the home, pistol-whipped them, and threatened to cut off their arms. During the raid, police discovered Mother, six months pregnant with Jose D.'s child, asleep upstairs with J.J., and T.J., who has a different father.[1] The police also found a knife, marijuana, and a pipe with marijuana residue on a coffee table; a pound of marijuana in the refrigerator; a pound of marijuana, a scale, and an ecstasy pill in Mother's bedroom; and a loaded gun in the couch cushion.

¶3 The Department of Child Safety ("DCS") took J.J. into temporary physical custody and the juvenile court subsequently found him dependent. J.J. was later diagnosed with Post Traumatic Stress Disorder ("PTSD"), had significant behavioral problems at school necessitating attendance in a classroom for emotionally disturbed students, had suicidal

---

[1] Mother's parental rights to all three children have been terminated but she is not a party to this appeal.

ideations, made significant disclosures of sexual abuse, and was acting out sexually.

¶4        In May 2012, after Father's paternity was established, DCS offered Father services as part of the reunification plan, including parenting classes, domestic violence counseling, psychological evaluation, weekly telephonic visits, in-person supervised visitation in Arizona, and an Interstate Compact for the Placement of Children ("ICPC") home study in North Carolina.  By February 2013, Father had completed a parenting class, including a workshop on the impact of domestic violence on children, and the ICPC home study was approved.  However, by June 2013, concerns emerged regarding Father's ability to parent J.J., primarily related to Father's substance abuse issues and inconsistency in attending counseling sessions.

¶5        In March 2015, DCS filed a petition to terminate Father's parental rights based on Arizona Revised Statutes ("A.R.S.") sections 8-533(B)(3) (chronic substance abuse) and -533(B)(8)(c) (fifteen months out-of-home placement).  The severance hearing was held over the course of eleven days in February 2016.  After presenting its evidence, DCS withdrew the allegation regarding Father's chronic substance abuse.  The juvenile court granted the petition based solely on the out-of-home placement ground, and this timely appeal followed.

**DISCUSSION**

¶6        To support an order terminating parental rights, the juvenile court must find at least one statutory ground is supported by clear and convincing evidence.  *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 78, ¶ 6 (App. 2005).  Additionally, the court must find by a preponderance of the evidence that the termination is in the best interests of the child.[2]  A.R.S. § 8-533(B); *Mario G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 282, 285, ¶ 11 (App. 2011).  As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts."  *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).  Accordingly, we will accept the court's findings of fact

---

[2]        Father does not challenge the juvenile court's finding that termination of his parental rights is in J.J.'s best interests and thus we do not address it.

"unless no reasonable evidence supports those findings." *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997).

**¶7**   To meet its burden of proof under A.R.S. § 8-533(B)(8)(c), DCS is required to prove (1) the child has been in an out-of-home placement for at least fifteen months; (2) DCS "made a diligent effort to provide appropriate reunification services;" (3) "the parent has been unable to remedy the circumstances" causing the out-of-home placement; and (4) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." The relevant circumstances are those existing at the time of severance. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 96 n.14, ¶ 31 (App. 2009).

**¶8**   Father argues the juvenile court erred as a matter of law in severing his parental rights because DCS "failed to prove a basis for severance that withstands constitutional scrutiny."[3] Father contends that as the "non-offending parent," he did nothing to warrant the removal of J.J. from Mother's home. He asserts further that DCS "failed to present any evidence that he would make choices detrimental to J.J.'s welfare."

**¶9**   Father cites a California case, *In re Isayah C.*, in arguing that he had a right to custody of J.J. when DCS removed the child from Mother's home after the police raid. 13 Cal. Rptr. 3d 198 (Cal. Ct. App. 2004) ("[A] nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be detrimental to the safety, protection, or physical or emotional well-being of the child."). Assuming without deciding that Father was a "nonoffending parent" at the time of J.J.'s removal, Father's argument fails because nothing in the record shows that he challenged the juvenile court's dependency order. Moreover, California's statutory requirements governing physical custody determinations in dependency matters are significantly different than Arizona's. *See, e.g.*, Cal. Welf. & Inst. Code § 361(c)(1) (West) (2016) (modified as amended) ("The court shall consider, as a reasonable means to protect the minor . . . allowing a nonoffending parent or guardian to retain

---

[3] Father also challenges the juvenile court's finding that DCS made a diligent effort to provide appropriate reunification services. Because Father failed to object to the adequacy of services during the pendency of the juvenile court proceedings, he has waived that issue on appeal. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179, ¶ 18 (App. 2014). Waiver aside, the record reflects DCS provided appropriate reunification services to Father.

custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm.").

¶10            Father asserts that a parent's inability to care for a special needs child may not be considered as part of a statutory ground for severance, but only in considering whether severance would be in a child's best interests, citing *Jordan C.*, 223 Ariz. at 95, ¶ 28, and suggests the law in this area is unsettled. The issue in *Jordan C.* was whether the juvenile court properly terminated parental rights based on fifteen months' out-of-home placement. *Id.* at 92-93, ¶ 16. We explained that although termination would be in the children's best interests because mother could not meet their special needs, that conclusion did not relieve DCS's duty to prove a statutory ground for severance. *Id.* at 97-98, ¶¶ 33-36. We did not find, as Father asserts, that evidence of a child's special needs may only be considered as part of a best interests determination.

¶11            Father takes issue with the juvenile court's reliance on *Maricopa County Juvenile Action No. JS-8441*, 175 Ariz. 463, 467 (App. 1993) (abrogated on other grounds by *Kent K. v. Bobby M.*, 210 Ariz. 279, 282, ¶ 12 (2005)), for the court's conclusion that Father's inconsistent participation in services for a special needs child can constitute the circumstances causing the out-of-home placement. Father's argument is misplaced. In *JS-8441*, the father argued that because the child's medical needs were continually changing, he had no notice of what steps he needed to take to remedy the out-of-home placement and, therefore, the court should have limited its inquiry to whether he remedied the circumstances alleged in the dependency petition, not at the time of severance. *Id.* We refused to adopt this narrow reading, finding the dependency statute clearly referred to the circumstances that "cause" the out-of-home placement; present tense, not past. *Id.* Further, we found that, as here, the father failed to consistently participate in services offered to allow him to reunify with his child.

¶12            Contrary to Father's suggestion, the juvenile court here did not find that J.J.'s special needs, standing alone, constituted the grounds for severance. Instead, the court found that Father (1) failed to consistently engage in services, such as completion of recommended counseling; (2) failed to participate in the vast majority of the monthly child and family team meetings ("CFTs"), even though his attendance was important and expected; (3) admitted he did not contact DCS regularly for updates, failed to thoroughly review DCS reports because he did not like what they said, and never spoke with any of J.J.'s therapists; (4) failed to maintain consistent contact with J.J. through cards, gifts, letters, or emails; and (5)  visited him

in person fewer than a dozen times over four years, despite DCS's offer to pay his expenses for monthly visits. The court noted Father's lack of consistency and significant delays with substance abuse treatment hindered the possibility of J.J. residing with Father during the early stages of the case. The court concluded that Father had not demonstrated a willingness or an ability to address J.J.'s special needs and his significant behavioral issues. The record supports these findings.

¶13      At trial, Aimee Wade, J.J.'s high-needs case manager, testified she had been working with J.J. for over three years. Wade stated that J.J. receives individual therapy and art therapy, and she personally takes him on outings, spending one day per month with him alone. Wade also facilitates the monthly CFTs for J.J.[4] Wade explained that if the biological parents do not participate, it impairs their ability to understand a child's progress. Wade testified that she did not have an email address for Father, so she frequently left phone messages with the date and time for the scheduled CFTs. Wade testified that Father appeared telephonically for approximately six to eight CFTs over the course of the dependency; sometimes voluntarily calling in, other times the team would have to call him. Regardless, Wade testified that Father's mother (J.J.'s paternal grandmother) mostly participated in the CFTs and that Father was not actively involved in J.J.'s treatment or therapy. Wade further testified she receives reports from J.J.'s school that he acts out when he is aware of upcoming visits with Father.

¶14      DCS case manager Victoria Jones testified that during a 2013 therapy session, J.J. reported he had been sexually abused and he has received psychological and psychiatric evaluations, resulting in diagnoses of PTSD and attention deficit hyperactive disorder. In addition to the high-needs case manager, he has several individual counselors and participates in art therapy. Jones explained that at the start of the proceedings, J.J. was extremely troubled and was verbally and physically abusive towards Mother. Jones testified that J.J. would curl up and hide behind the furniture and injure himself to force an end to the visits with Mother.

¶15      Jones further testified that DCS provided various services to Father, including: (1) referral for an ICPC home study in North Carolina; (2) drug testing in North Carolina; (3) recommendation that he meet with a therapist before a plan was in place to transition J.J. to North Carolina; (4)

---

4      J.J.'s team includes the DCS case manager, behavior coaches, therapists, mentors, guardian ad litem, foster parents, and biological parents.

parenting classes; and (5) visitation with J.J. in Arizona. Jones noted that the juvenile court granted Father's request that he be allowed to provide his own counselor for J.J. in North Carolina. Jones stated she provided Father with notice of required services during court hearings, as well as providing notice via service letters, emails, and phone calls. Yet Father was slow to engage in services and did not take seriously J.J.'s needs, even though Jones personally advised him during a court hearing that J.J. had been diagnosed with PTSD and Father should educate himself on that condition.

¶16        Jones testified that DCS provided Father with in-person visitation with J.J. whenever he was in Arizona and that in January 2015 Jones' supervisor invited Father to fly to Arizona once per month at DCS's expense (airfare and hotel) to visit and bond with J.J.[5] Although Father participated in individual therapy in North Carolina, by early 2014 he had suspended his therapy sessions and did not seek additional therapy. Father "stopped and started" substance abuse testing and treatment, was arrested for DUI, and only visited with J.J. over the phone or when he occasionally came to Arizona.

¶17        Jones testified that Father seemed unmotivated to attend the CFTs, attending only a few telephonically. She explained it was important for Father to attend the CFTs because it was the primary method to understand J.J's special needs. Jones noted that during the one CFT Father personally attended, the team encouraged Father to continue with weekly calls to J.J. and to send him cards, letters, gifts, and emails to help bond. Yet, Father did not do so.

¶18        Jones testified further that Father's North Carolina therapist diagnosed him with oppositional defiant disorder, conduct disorder, and antisocial personality traits, which were lifelong issues that had not been faced. Jones testified that Father's therapist does not believe Father poses a threat to J.J., but that Father was not in a position to parent a special needs child because of Father's own mental health issues. Because Father

---

[5]        In his reply brief, Father argues that DCS provided no direct evidence that the offer to pay travel expenses was ever made to him, asserting that Jones' testimony constituted hearsay. Father, however, failed to object to Jones' testimony and has therefore waived that argument. *See Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 239, ¶ 14 (App. 2012) (absent fundamental error, a party who fails to raise an issue at trial waives the right to assert it on appeal). Father makes no assertion that the juvenile court's consideration of Jones' testimony regarding the offer to pay travel expenses was fundamental error.

discontinued therapy, Jones said those issues had yet to be addressed. She testified that Father's pattern of starting and stopping therapy evidences an apathetic approach to his services and thus triggered concerns that he would not be able to meet J.J.'s special needs. Jones explained that J.J. is very challenging—he needs diligent, constant care and someone proactive and aggressive with respect to his special needs. According to Jones, over the course of four years, Father did not demonstrate those personality traits, did not fully engage with J.J., was unable to remedy the circumstances which brought J.J. into care, and likely would not be able to parent J.J. in the near future.

¶19 Father testified that he knew Mother was pregnant with J.J. when he moved to another state. Father also admitted he did not provide any support throughout the pregnancy, was not there when J.J. was born, did not sign the birth certificate, and did not establish paternity until the dependency proceedings. Father stated J.J. stayed with him and his mother in North Carolina for a few months each summer from 2008-2011, and that he called J.J. once per week or month in between those visits. Father admitted he and Mother engaged in domestic violence and was aware Mother was involved in domestic violence with another man when he allowed Mother to take J.J. back to Arizona in 2011. Father explained that in all his visits and phone conversations with J.J., the child never acted out sexually or harmed himself; Father claimed all of that behavior started when J.J. came into DCS care.

¶20 Father testified further that DCS did not arrange for him to speak with J.J.'s counselors or appear telephonically for any counseling sessions, nor provide him with the contact information for J.J.'s therapists or even the type of therapy he was receiving. Father stated DCS did not keep him updated on J.J.'s progress in counseling, explain the services Father could participate in that would better educate him on J.J.'s needs, or even give him a list of services or providers in North Carolina. He said that although DCS offered him visitation with J.J. in Arizona, it never offered to transport J.J. to visit him in North Carolina, or pay for Father to fly to Arizona. Much of this testimony contradicted testimony offered by DCS; it is not our role, however, to judge the credibility of witnesses. *Oscar O.*, 209 Ariz. at 334, ¶ 4.

¶21 Father acknowledged he had done nothing to understand or learn how to deal with J.J.'s anxieties, made no effort to contact J.J.'s DCS case manager, did not know why J.J. received a diagnosis of PTSD, and never spoke to J.J.'s high-needs case manager or any of the therapists. Father admitted that he stopped attending his own counseling sessions and

did not have a plan to deal with J.J.'s self-harming behavior and sexual abuse trauma. He acknowledged he has the DCS case manager's email address, but had not contacted her for updates on any of J.J.'s therapies. Nor is he aware of J.J.'s medical or dental needs, or his status at school. Father also admitted that he merely skimmed some of the court reports because he did not like the content and only read portions of the psychological evaluations.

¶22 Given this record, we conclude that reasonable evidence supports the juvenile court's determination that Father was unable to remedy the circumstances causing J.J. to be in an out-of-home placement and would not be able to exercise proper and effective parental care and control in the near future.

## CONCLUSION

¶23 Based on the foregoing, we affirm the juvenile court's order terminating Father's parental rights to J.J.

